## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | | |
|---|---|---|
| MILTON ROSS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV419-201 |
| | ) | |
| DR. OLATUNJI AWE, and | ) | |
| CYNTHIA RIVERS, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AND REPORT AND RECOMMENDATION

Before the Court are Defendants Dr. Olatunji Awe and Cynthia Rivers' Motion to Exclude Plaintiff Milton Ross' Proffered Expert Witness Testimony ("*Daubert* Motion"), doc. 61, and their Motion for Summary Judgment, doc. 60. Ross responded in opposition to both motions. Docs. 66 & 67. For the following reasons, Defendants' *Daubert* motion is **GRANTED, in part**, and **DENIED, in part**, doc. 61, and the Motion for Summary Judgment should be **GRANTED, in part**, and **DENIED, in part**, doc. 60. The Court **DEFERS** ruling on Defendants' request for summary judgment on Ross' Eighth Amendment deliberate indifference claim against Awe pending additional briefing on the issue, as discussed below. Doc. 60, in part.

1

## BACKGROUND

On May 23, 2018, while incarcerated at Coastal State Prison ("CSP"), Ross accidentally flushed his top denture down a toilet. Doc. 60-2 at 5; doc. 67-7 at 7; doc. 60-20 at 6. He did not obtain a replacement denture until approximately 16 months later. Doc. 60-15 at 96. Ross testified that he experienced cuts and blisters on his gum, difficulty chewing, weight loss, and difficulty sleeping throughout this period. *See, e.g.*, doc. 60-20 at 24. He brought Eighth Amendment deliberate indifference claims against Awe, CSP's Medical Director, and Rivers, CSP's Chief Counselor and Grievance Coordinator, for their alleged failure to provide him access to "necessary dental care—*i.e.*, replacement dentures—for over 16 months." Doc. 41 at 13. He also brought retaliation claims against Defendants, alleging they failed to facilitate his dental care because he filed a prior unrelated lawsuit against another CSP official. *Id.* at 15-16.

## I.   _Background relevant to Ross' claims against Awe._

Awe met with Ross monthly to renew Ross' Fentanyl prescription to treat his chronic back and leg pain. Doc. 60-2 at 5; doc. 67-7 at 7.[1] The two disagree about their conversations during these monthly appointments, and consequently disagree about when Awe first learned of the missing denture. Awe asserts that he first learned that Ross lost his denture during their October 4, 2018, appointment, and that Ross did not make any complaints regarding his denture or mouth at any of their other six appointments between May 23, 2018 and that date. Doc. 60-4 at 2-6 (Awe's Declaration). Awe explains that he would have noted Ross' complaints regarding his mouth in the Medical Encounter Forms he generated from their appointments; however, those forms do not include such a notation. _Id._ By contrast, Ross testified that he told Awe about his missing denture and related symptoms "every time" the two met,

---

[1] As discussed below, several of the appointments occurred in intervals of less than one month.

including during an appointment within a day or two of losing the denture. Doc. 60-20 at 8, 11.

The parties do not dispute other aspects of the monthly appointments before October 4, 2018. For example, CSP staff recorded Ross' weight at the appointments, which progressively decreased from 141 pounds on May 1, 2018, to 133 pounds on July 23, 2018.[2] Awe prescribed Ross Ensure at the May 29, 2018 appointment. Doc. 60-2 at 7; doc. 67-7 at 9. Ross' weight increased to 138 pounds at his August 20, 2018 and September 13, 2018 appointments. Doc. 60-2 at 10; doc. 67-7 at 12, 13. At the September appointment, Awe assessed Ross as having chronic back and leg pain with spasm, that he was underweight, that his weight is stable, and that he "can't take Ensure." Doc. 60-2 at 9; doc. 67-7 at 11. Awe prescribed him an additional snack at that appointment. Doc. 60-2 at 9; doc. 67-7 at 11.

---

[2] Before the May 29, 2018 appointment, a nurse recorded that Ross weighed 137.4 pounds, which is less than his weight of 141 pounds recorded on May 1, 2018. Doc. 60-2 at 6; doc. 67-7 at 8. At his June 25, 2018 appointment, a nurse recorded his weight as 134.6 pounds. Doc. 60-2 at 7; doc. 67-7 at 9. At his July 23, 2018 appointment, a nurse recorded Ross' weight as 133 pounds. Doc. 60-20 at 8; doc. 67-7 at 10 (the parties agree that a nurse "review[ing]" this Medical Encounter Form "interpreted" Ross' weight on July 23, 2018 to be 135 pounds).

The Medical Encounter Form Awe generated from Ross' October 4, 2018 appointment indicates that Ross complained to Awe about pain and swelling in his gum.  Doc. 60-2 at 11; doc. 67-7 at 13-14.  Ross did not have any fever or jaw swelling, and Awe asserts that he did not see any swelling, infection, or inflammation in Ross's upper gum.  Doc. 60-2 at 11; doc. 67-7 at 13-14.  Awe diagnosed Ross with chronic low back and leg pain with spasm and acute gingivitis secondary to dentures.  Doc. 60-2 at 11; doc. 67-7 at 14.  Awe renewed Ross' fentanyl patch, prescribed an antibiotic, and told Ross to increase his dental hygiene and follow up with a dentist.  Doc. 60-2 at 11; doc. 67-7 at 14.  Awe testified that "the infection that he [had on October 4, 2018]. . . is not because he didn't have any denture. [sic]"  Doc. 60-2 at 11 (quoting doc. 60-10 at 94).  Ross testified that Awe prescribed the antibiotics after Ross took his bottom dentures out to show Awe his cuts and blisters, and told Awe that he was suffering earaches, loss of sleep, and jaw pain.  Doc. 67-7 at 14 (citing doc. 60-20 at 11).

Ross had several meetings in CSP's medical department to refill his prescription medications during November of 2018.  Doc. 60-2 at 11-12; doc. 67-7 at 14; *see also* doc. 60-4 at 6-7.  The Medical Encounter Forms

from those meetings do not note that Ross complained about his mouth, dentures, or weight.  Doc. 60-2 at 11-12; doc. 67-7 at 14.  Awe's declaration suggests that this indicates Ross did not complain about his mouth, dentures, or weight during those meetings, doc. 60-2 at 11-12 (citing doc. 60-4 at 6-7), though Ross testified that he complained about those issues at each of his visits to the medical department.  Doc. 67-7 at 14.  Ross subsequently met with Awe for a December 17, 2018 appointment.  Doc. 60-2 at 11-12; doc. 67-7 at 14.  Awe asserts that Ross did not complain about his mouth, dentures, or weight, doc. 60-4 at 7-8, and Ross testified that he did, *see, e.g.*, doc. 60-20 at 8.

During the relevant time, CSP contracted with MHN Centurion ("MHN"), a company providing dental services to the Georgia DOC, to provide dental services to inmates.  Doc. 60-2 at 2; doc. 67-7 at 3.  MHN did not have an in-house dentist assigned to CSP from "early 2018" until November 2018, when Dr. David Gevirtz began working at the prison.  Doc. 60-2 at 2-3; doc. 67-7 at 3.  Gevirtz testified that CSP did not have a dentist for approximately "six or seven months" before his arrival, though "[t]hey had somebody coming in occasionally . . . [I]t was sporadically."  Doc. 60-15 at 106.  Ross asserts that Awe's interrogatory responses

"show[ ] no dentist providing services to inmates at CSP between April 6, 2018 and November 5, 2018)."  Doc. 67-7 at 14.[3]  Gevirtz testified that:

> Mr. Ross had already been placed on the denture list long before I got there.  And, you know, when I first got there, it was basically just getting through a mountain of acute infections that were urgently needed to be treated, you know.  You know, the lowest priority at that point was making dentures, not only for Mr. Ross, but every other offender who was on the denture list before him[.]

Doc. 60-2 at 12; doc. 67-7 at 15.

Gevirtz met with Ross for the first time on January 10, 2019.  Doc. 60-2 at 12; doc. 67-7 at 15.  Gevirtz testified that he did not see any cuts, swelling, or bleeding in Ross' top arch.  Doc. 60-2 at 12-13; doc. 67-7 at 15.  Gevirtz identified a "denture sore spot" on Ross' lower arch, "just from the lower denture rubbing his gum."  Doc. 60-2 at 12-13; doc. 67-7 at 15 ("What was bothering him was that he had a sore spot from the lower denture from the—we call it the flange or the edge of the lower denture just rubbing into the gum.").  He filed down the length of the flange that was rubbing against Ross' lower gum at the appointment. Doc. 60-2 at 13; doc. 67-7 at 15.  Gevirtz testified that this procedure "took away all the inflammation", explaining that the inflammation had

---

[3] The Court was unable to locate the interrogatory responses on the docket.

subsided when he saw Ross at a subsequent appointment. Doc. 60-15 at 103. Ross testifies that "when [Gevirtz] filed [it] down it got [worse]." Doc. 60-20 at 14.

Ross had an appointment with Awe on January 17, 2019, at which he weighed 141 pounds, and an appointment with another doctor on March 26, 2019, at which he weighed 147 pounds. Doc. 60-2 at 13; doc. 67-7 at 15-16. Awe asserts that Ross did not complain about his dentures or mouth at the January 17, 2019 appointment. Doc. 60-4 at 8. He also asserts that the Medical Clinic Follow Up Form from the March appointment does not reflect that Ross complained about his dentures or mouth. *Id.* Ross testified that he complained to Awe about his dentures every month but does not specifically address this appointment. Doc. 67-7 at 16; *see also* doc. 60-20 at 11 (Ross' testimony that he spoke to Awe about the dentures "every month" since he "had to see him every 30 days.").

On June 25, 2019, Gevirtz made impressions for Ross' upper and lower dentures. Doc. 60-2 at 13; doc. 67-7 at 16. Ross received new upper and lower dentures from Gevirtz on October 3, 2019. Doc. 60-2 at 14; doc. 67-7 at 16. Gevirtz testified that he did not observe cuts, swelling,

bleeding, or inflammation in Ross' mouth at either of those appointments. Doc. 60-2 at 13-14; doc. 60-15 at 110 (asserting that "if there was any kind of infection, obviously swelling, cuts or anything that required antibiotic, it would have been noted[.]").[4]

Ross contends that Awe's inaction is related to Ross' prior litigation against another prison official. Doc. 41 at 15. During the period when Ross was missing his denture, Awe was aware of Ross' previously-filed lawsuit against Dr. Fogham, a former CSP employee. Doc. 60-2 at 14; doc. 67-7 at 17. Awe asserts that this knowledge did not impact his treatment of Ross. Doc. 60-4 at 8-9. Ross testified that Awe told him " 'I done got you some antibiotic for your mouth. So I know you fixing to go do whatever you're going to do. You're fixing to write some grievance up

---

[4] In Ross' Responses to Defendants' Statement of Undisputed Material Facts, Ross disputes that Gevirtz did not see mouth inflammation at this appointment, explaining that Ross testified that "his discomfort subsided only after he got dentures[.]" Doc. 67-7 at 21. Specifically, he testified:

> The only thing that's going on in my mouth [now] is this soreness up under my jawbone, but it ain't as bad as when I was in prison. . . . I got hanging [skin in my mouth now.] It was some more, but some of it done healed a little bit. . . . But they – he said they were going to get me surgery to get that cut out of there before they . . . make some dentures, but they didn't do that, either. But I . . . didn't want it, but since he went ahead and put some dentures in my mouth I was happy with that.

Doc. 60-20 at 25.

on me or file a lawsuit.' He said, 'it ain't going nowhere.' He said, 'go do what you're going to do.' " Doc. 60-20 at 22.

II.   *Background relevant to Ross' claims against Rivers*

Cynthia Rivers was the Chief Counselor and Grievance Coordinator at CSP from 2016 to 2020. Doc. 60-2 at 2; doc. 67-7 at 2. She was responsible for overseeing the prison's grievance process. Doc. 60-2 at 2; doc. 67-7 at 2. Ross testified that he filed a grievance regarding his dentures with Rivers in June 2018, doc. 60-20 at 15, and a second in July 2018, *id.* at 16. The parties do not dispute that Ross informed Rivers about the denture problem in October 2018; however, Rivers testified that this was the first time she was aware of the problem. Doc. 60-2 at 15; doc. 67-7 at 18. She testified: "I do recall him stopping me, letting me know that he dropped his dentures in the toilet; and he was vomiting; and he flushed them. And he had some cuts and stuff in his mouth." Doc. 60-18 at 68-69.

She testified that she remembers subsequent encounters in which Ross told her about the denture problem:

> An[d] every time that I had an encounter with [Ross], I went to medical to find out what was going on and, you know, where it was; because during that time, a time we did not have a dentist. So every time when I saw him, I inquired. I went to

> dental to find out what was going on; and when we did get a
> dentist, letting him know what was going on with his
> dentures.

Doc. 60-2 at 15 (quoting doc. 60-18 at 77); doc. 67-7 at 18.  Rivers spoke

to CSP dental department staff twice regarding Ross' dentures: once in

October 2018, and the second time in either October or November 2018.

Doc. 60-2 at 15-16; doc. 67-7 at 18.  During one of those conversations,

the dental department staff told Rivers that "they had several . . . sick

call forms" from Ross.  Doc. 60-2 at 16; doc. 67-7 at 18; doc. 60-18 at 80-

81 (Rivers deposition transcript).  The staff members told Rivers that

"because [CSP] did not have a dentist at that time, they were sending

other offenders out for emergency situations; and they didn't consider

[Ross' denture problem] as being an emergency[.]"  Doc. 60-18 at 78-79;

doc. 60-2 at 16; doc. 67-7 at 18-19.  On October 20, 2018, Rivers wrote an

email to Sabrina Gregory, CSP's Health Service Administrator.  Doc. 60-

2 at 16; doc. 67-7 at 19.[5]  In the email, Rivers notes that Ross lost his

dentures, that he has lost weight, that "he cannot eat and his gums are

---

[5]  Ross correctly notes that Awe's assertion in his Statement of Undisputed Material
Facts that Rivers sent the email on October 8, 2018 is inconsistent with the email's
October 20, 2018 timestamp.  Doc. 67-7 at 19; *see also* doc. 60-19 at 1 (email).  Awe
did not file a reply clarifying this discrepancy; nevertheless, the email is dated
October 20, 2018.  Doc. 60-19 at 1; *see also* doc. 60-18 at 90.

raw and cut up", that he cannot drink Ensure, and that he "has filed [sic] out several sick call slips to be seen by a Dentist at another facility but he has not received a callout."  Doc. 60-19 at 1 ("I am not sure if anything can be done and of course he filed a grievance.  Please help.").

After Gevirtz started working at CSP, Rivers told him about Ross' denture problem.  Doc. 60-2 at 16; doc. 67-7 at 19.  Gevirtz told her that Ross "was No. 3 or 4 on the list as far as getting his dentures, and it's a process."  Doc. 60-2 at 16; doc. 67-7 at 19.  Rivers never spoke with Awe about Ross' need for replacement dentures.  Doc. 60-2 at 16; doc. 67-7 at 19.  Rivers explained that Awe "is the medical director.  He has no—I'm not going to say no contact with dental, so me talking to him or, you know, he knew—Just me talking to him would not–You know, he has no contact with the dental area.  They—He handles medical, and the dentists handle the dentist area."  Doc. 60-18 at 85.

Ross testified that after he spoke to Rivers in October 2018, he wrote a letter to her indicating that, based on Awe's deficient care for his mouth and failure to send Ross to a different facility for treatment, and Rivers' failure to "answer [his] grievance[s]", he was planning to "go ahead and try to take it to the court."  Doc. 60-20 at 19.  Ross testified

that after he sent the letter, Rivers sent Lewis Brown, his CSP counselor, to talk with him.  Doc. 60-20 at 19-20.  He explained that Brown told him that Rivers sent Brown "to talk to [Ross] about the grievance [in order to avoid going to] court because she's going to get it taken care of."  *Id*. Rivers testified that she never spoke with Brown about Ross' dentures. Doc. 60-18 at 90.

Sometime before 2014 when Rivers was a counselor in Ross' CSP building, Ross told her that he filed a lawsuit.  Doc. 60-2 at 17; doc. 67-7 at 20.  Rivers did not know the identity of the defendants or the nature of the suit.  Doc. 60-2 at 17; doc. 67-7 at 20.  Rivers asserts that although she was aware in 2018 and 2019 that Ross previously filed a lawsuit, she did not treat him any differently, or process his grievances any differently.  Doc. 60-17 at 2.  Ross, however, testified that she refused to process his grievances as retaliation for the previously-filed lawsuit because "all of [CSP's medical staff are] friends."  Doc. 60-20 at 23.

## ANALYSIS

I.  *Defendants' Daubert Challenge to Ross' Expert Dr. Jay Shulman*

Defendants seek to exclude opinions rendered by Ross' expert Dr. Jay Shulman, a dentist with experience in correctional institution dental

care who opines on, *inter alia*, the adequacy of Awe's treatment of Ross' alleged dental condition.  Doc. 61-1 at 1 (Awe's *Daubert* brief); doc. 61-2 (Shulman's Report and CV).   Defendants first argue Shulman is unqualified to render an opinion on Awe's medical treatment of Ross. Doc. 61-1 at 6.  They also identify ten specific opinions which they contend should be excluded.  *Id.* at 8-13.

Federal Rule of Evidence 702 compels the Court to perform a "gatekeeping" function concerning the admissibility of expert scientific evidence.  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 n.7, 597 (1993)). In performing this task, the Court must consider whether the party offering the evidence has shown:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir.1998)).  The proponent of the expert opinion bears the burden of establishing qualification, reliability, and

helpfulness by a preponderance of the evidence. *Daubert*, 509 U.S. at 592, n.10.

Under the first prong, "experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." *Frazier*, 387 F.3d at 1260–61; *see also* Fed. R. Evid. 702 (a witness may be qualified as an expert by "knowledge, skill, experience, training, or education[.]").   But, "[w]hen an expert witness relies mainly on experience to show he is qualified to testify, 'the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.' " *Payne v. C.R. Bard, Inc.*, 606 F. App'x 940, 942-43 (11th Cir. 2015.) (quoting *Frazier*, 387 F.3d at 1261).

As to the second prong, the reliability "criterion remains a discrete, independent, and important requirement for admissibility." *Frazier*, 387 F.3d at 1261.  "The Supreme Court in *Daubert* set out a list of 'general observations' for determining whether expert testimony is sufficiently reliable to be admitted under Rule 702." *United States v. Brown*, 415 F.3d 1257, 1267 (11th Cir. 2005) (citation omitted).  These factors, or

observations, inquire into the expert's "theory or technique" and are: "(1) whether it can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) what its known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field." *Id.* (citation omitted). "Sometimes the specific *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful." *Frazier*, 387 F.3d at 1262. "Indeed, the Committee Note to the 2000 Amendments of Rule 702 expressly says that, '[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.' " *Id.* at 1261.

Expert testimony must also assist the trier of fact. *Frazier*, 387 F.3d at 1262. "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Id.* (citation omitted). This inquiry is commonly called the "helpfulness" inquiry. *Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021) (citing *Frazier*, 387 F.3d at 1260). "Expert testimony which does

not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (quoting *Daubert*, 509 U.S. at 591).

Finally, "[b]ecause of the powerful and potentially misleading effect of expert evidence, [Cit.] sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying [Federal Rule of Evidence] 403." *Frazier*, 387 F.3d at 1263. Rule 403 provides that:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 403. "Indeed, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses. . . . Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *Frazier*, 387 F.3d at 1263.

Defendants challenge each of ten listed opinions by reasserting the same conclusory argument: "This opinion . . . is not based upon any recognized scientific method[.]"  Doc. 61-1 at 8-13. Shulman's report,

however, explains that his opinions are based on, among other sources, his "50 years of professional experience in dentistry[.]"  Doc. 61-2 at 3; *see also* doc. 66 at 12 (Ross's unrebutted response that the Court should reject Defendants' "recognized scientific method" argument because Shulman relied on, among other sources, "his training and expertise"); *see generally* docket (Awe did not file a reply to clarify his argument). Defendants do not acknowledge the "meaningful differences in how reliability must be examined with respect to expert testimony that is primarily experiential in nature as opposed to scientific."  *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007); *see generally* doc. 61-1.[6]  An expert's experience-based opinion clears *Daubert*'s reliability hurdle if the expert "explain[s] how [his] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion and how that experience is reliably applied to the facts."  *Frazier*, 387 F.3d at 1261 (emphasis in original) (citation omitted).

Defendants do not explain why Shulman's opinions require a "recognized scientific method" to be reliable, and the Court declines to

---

[6]  *See also  Robles v. United States*, 2020 WL 8254267, at *2 (E.D. Va. Oct. 15, 2020) ("While [p]urely scientific testimony . . . is characterized by its falsifiability, or refutability, or testability, experiential expert testimony does not rely on anything like a scientific method." (internal quotations and citations omitted)).

construct an argument for them. *See Hannah v. Armor Corr. Health Servs., Inc.*, 2021 WL 1777881, at *6 (M.D. Fla. Mar. 8, 2021) ("The Court is mindful that the exclusion of expert testimony is an *exception*, not the rule, for evidentiary admissions under *Daubert*, *Kumho Tire*, and the Federal Rules of Evidence. . . . Moreover, the Court need not develop Plaintiff's conclusory arguments or address arguments unsupported by authority.") (emphasis in original) (internal citations omitted); *see also United States v. McCluskey*, 954 F. Supp. 2d 1224, 1270 (D.N.M. 2013) ("Since Defendant fails to cite specific, persuasive authority for most of these bases [for exclusion], however, and the Court need not develop Defendant's conclusory arguments or address arguments unsupported by authority, the Court declines to address most of these points."). *Cf. United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). Accordingly, to the extent Defendants seek to exclude Shulman's opinions because they are not based on a "recognized scientific method", that request is **DENIED**. Doc. 61, in part.

Defendants also vaguely argue that Shulman is not qualified to render "any opinion . . . regarding medical care that Dr. Awe rendered to

Ross." *See* doc. 61-1 at 6.  They do not clarify their use of the phrase "medical care" or attempt to distinguish Shulman's "medical care" opinions from his "non-medical care" opinions.  *Id.*  Shulman's report includes opinions regarding, *e.g.*, the adequacy of Awe's prescriptions for Ross, Awe's ability to facilitate Ross' dental referral, and whether Awe's treatment was delayed, *see* doc. 61-2 at 9-14, all of which are related to "medical care."  As discussed below, Shulman is qualified to render certain opinions regarding Awe's responses to Ross' alleged symptoms, and the Court declines to issue a blanket exclusion on such opinions.  Accordingly, the Court will address Defendants' "qualification" challenges specific to the ten opinions listed below.

Finally, Shulman's report contains numerous opinions regarding Awe's state of mind.[7]  "Courts have recognized that the issue of what other parties did or did not know is not a proper subject of expert

---

[7] *See, e.g.*, doc. 61-2 at 10 ("[T]here is record evidence suggesting that Dr. Awe knew—or should have known—of Mr. Ross' painful dental condition as of 5/29/18."); *id.* ("[Awe's] behavior suggests to me that he is indifferent to that fact that Mr. Ross, who was his patient, had no opportunity to receive dental care[.]"); *id.* at 12 ("Thus, Dr. Awe advising Mr. Ross to submit a dental sick call request while knowing there was no dentist at CSP amounted to him turning a blind eye to Mr. Ross's predicament."); *id.* at 12-13 ("Surely, [Awe] did not doubt his authority to contact the state dental director."); *id.* at 13 ("Dr. Awe was aware of Mr. Ross's [symptoms]."); *id.* ("Dr. Awe knew (or should have known) that these conditions . . . would not improve . . .").

testimony." *Garcia v. Vitus Energy, LLC*, 2022 WL 1984037, at *5 (D. Alaska June 6, 2022) (citing *Gomez v. Am. Med. Sys. Inc.*, 2021 WL 1163087, at *5 (D. Ariz. Mar. 26, 2021)).  While Ross defends Shulman's opinions about Awe's state of mind, he does not address the authority[8] explaining that such testimony is inadmissible.  *See* doc. 66 at 12, 17. Accordingly, to the extent Shulman seeks to testify about what Awe "knew", that testimony is **EXCLUDED**, and Defendants' request to exclude testimony about what Awe knew, *see, e.g.*, do. 61-1 at 9-10, 12 is **GRANTED**.  Doc. 61-1, in part.

Awe also challenges several of Shulman's opinions regarding what Awe "should have known."  *See, e.g.*, doc. 61-1 at 10.  To prevail on his Eighth Amendment inadequate medical care claim, Ross must show that Awe was deliberately indifferent to his serious medical need.  *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007).  Deliberate indifference

---

[8] *See, e.g.*, *Arevalo v. Coloplast Corp.*, 2020 WL 3958505, at *21 (N.D. Fla. 2020) ("The jury can draw their own inferences about what Defendant knew without an expert's help."); *Cabot E. Broward 2 LLC v. Cabot*, 2018 WL 11309821, at *3 (S.D. Fla. July 26, 2018) ("The jury's determination of [a party's] state of mind should be based on the evidence, not [an expert's] opinion based on the evidence."); *see also United States v. Villanueva*, 2022 WL 1664501, at *5 (D.N.J. May 25, 2022) (excluding expert opinion about what Defendant "knew or did not know"); *Sanchez v. Duffy*, 416 F. Supp. 3d 1131, 1150 (D. Colo. 2018) (excluding expert opinion in deliberate indifference case about what Defendants did not know).

is a subjective standard; Ross must therefore show that Awe "*actually knew* that a substantial risk of serious harm existed[.]" *Byner v. Dunn*, 2022 WL 3367523, at *9 (M.D. Ala. July 11, 2022) (emphasis added). Accordingly, expert testimony regarding what an expert "should have known" is generally not relevant or helpful to a jury in a deliberate indifference case. *See, e.g.*, *Gomez v. Palmer*, 2016 WL 212952, at *6 (N.D. Ill. Jan. 19, 2016) ("Whether [a nurse] was deliberately indifferent is a subjective test and thus, what she 'should have known' is neither relevant nor helpful to the jury.").

Sometimes, circumstantial evidence about the obviousness of the risk at issue is admissible in deliberate indifference cases. As the Eleventh Circuit has explained:

> a factfinder is permitted to infer from circumstantial evidence that the [defendant] actually drew the inference that the circumstances posed a substantial risk of harm. . . . Indeed, it is possible to premise this inference on "the very fact that the risk was obvious." . . . The subjective test . . . precludes a finding of liability if the factfinder concludes that, even though a grave risk is obvious, no inference can be made that the actor actually became aware of the risk. . . . In this way, a plaintiff may rely solely upon circumstantial evidence related to the obviousness of a grave risk to satisfy [the subjective test], but the subjective test is satisfied only if the

circumstances also permit an inference that the actor "must have known" about the risk.

*Piamba Cortes v. American Airlines, Inc.*, 177 F.3d 1272, 1290-91 (11th Cir. 1999) (internal citations omitted) (quoting, *inter alia*, *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)); *cf. Pittman v. Cnty. of Madison*, 2015 WL 12743585, at *3 (S.D. Ill. Feb. 10, 2015) (permitting expert to testify about what defendants "should have known" in deliberate indifference case because the jury could infer defendants' subjective knowledge from the testimony). However, Ross does not argue that Shulman's opinions about what Awe "should have known" are admissible as circumstantial evidence of what Awe "must have known."[9] *Ajibade v. Wilcher*, 2018 WL 2930525, at *2 (S.D. Ga. June 11, 2018) ("The burden of establishing that [the *Daubert* test is] met rests with the proponent of the expert testimony, and not the *Daubert* challenger."). Accordingly, Defendants' request to

---

[9] *See, e.g.*, doc. 66 at 12 (briefly arguing that Shulman's opinion about what Awe "should have known" is admissible because it is an "opinion, based on record evidence . . . about [Ross'] dental condition."); *id.* at 16-17 ("Shulman's statement regarding what Defendant Awe . . . should have known about Plaintiff's dental condition . . . is not a 'legal conclusion' simply because it may be relevant to the ultimate issue of whether Defendant Awe acted with deliberate indifference.").

exclude testimony about what Shulman "should have known" is

**GRANTED**.  Doc. 61-1, in part.[10]

The Court will now turn to the ten specifically challenged opinions

in the Defendants' *Daubert* motion.

1. "Thus while Dr. Awe's notes do not describe Mr. Ross' dental condition until 10/4/18, there is record evidence that Dr. Awe knew—or should have known—of Mr. Ross' painful dental condition as of 5/29/18."  Doc. 61-1 at 2 (quoting doc. 61-2 at 10).

Defendants challenge this opinion as a "subjective opinion that

Ross's deposition testimony is true",[11] and an improper legal opinion

regarding Awe's subjective knowledge.  Doc. 61-1 at 9.  Although it is

---

[10]  Even if Ross articulated why Shulman's testimony about what Awe should have known is permissible circumstantial evidence in this deliberate indifference case, it is unclear whether that testimony would be helpful to a jury.  Shulman effectively opines that Ross telling Awe about his symptoms is evidence that Awe should have known about them.  *See, e.g.*, doc. 61-2 at 8-9 ("Ross testified that he told . . . Awe on each occasion about his [symptoms.] . . . Thus . . . there is record evidence [including, but not limited to that conversation] suggesting that Awe . . . should have known . . . of [Ross'] painful dental condition.").  Ross does not explain why it is "beyond the understanding of the average lay person" that a patient telling a doctor about symptoms should give rise to the doctor's knowledge of those symptoms.  *See Frazier*, 387 F.3d at 1262; *see also ODG-OU, L.L.C. v. Pierce Prop. Mgmt., LLC*, 2016 WL 11447824, at *3 (W.D. Okla. Jan. 19, 2016) ("The court is also concerned that the presentation of 'facts' couched within expert testimony may cause the jury to give more weight or credence to them merely because they are delivered by 'experts.' ").

[11]  To the extent Awe contends that Shulman may not rely on Ross' testimony because it is contradicted by Awe's testimony, courts have expressly rejected such arguments.  *See, e.g., Feliciano v. City of Miami Beach*, 844 F. Supp. 2d 1258, 1265 (S.D. Fla. 2012) ("[a]n expert is . . . permitted to base his opinion on a particular version of the disputed facts and the weight to be accorded to that opinion is for the jury." (quotations and citations omitted)).

unclear how the opinion regarding Awe's subjective knowledge is a "legal opinion," testimony regarding evidence of what Awe "knew" is **EXCLUDED**, as discussed above.  And, as also discussed above, Ross has not carried his burden of explaining why evidence of what Shulman "should have known" is relevant or helpful in this deliberate indifference case.  Finally, Ross does not attempt to salvage this opinion by arguing that it should be construed as a comment on what Awe "must have known" about Ross' dental condition because of its obviousness.  *See* doc. 66 at 12 (Ross characterizes the opinion as an assertion regarding what Awe "knew, or at least should have known, about [Ross'] . . . condition.").  In light of Ross' recognition that the opinion relates to the objective standard of what Awe "should have known", Defendants' motion to exclude it is **GRANTED**.  Doc. 61, in part.

2. "While Dr. Awe is not a dentist, his behavior suggests to me that he is indifferent to that fact that Mr. Ross, who was his patient, had no opportunity to receive dental care at CSP and that the only way Mr. Ross could receive appropriate treatment—rather than the treatment that is most convenient to Dr. Awe—would be if Dr. Awe initiated a dental consultation at another facility, like ASMP[.]" Doc. 61-1 at 2 (quoting doc. 61-2 at 10).

This opinion is **EXCLUDED** because it impermissibly comments on Awe's state of mind.  In the context of Eighth Amendment inadequate

medical care claims, courts have recognized that an expert opinion about whether a party was, *e.g.*, "deliberately indifferent", is inadmissible state-of-mind testimony.   *See, e.g.*, *Murphy v. Sandoval Cnty.*, 2019 WL 8331482, at *5 (D.N.M. Feb. 5, 2019) (excluding opinions about Defendants' "deliberate indifference" as state-of-mind opinions); *Wichterman v. City of Philadelphia*, 2019 WL 2568340, at *7 (E.D. Pa. June 20, 2019) (excluding expert testimony that a nurse was "blatantly indifferent" under Fed. R. Evid. 402 & 403).   Although Shulman uses the word "indifferent" without the adverb "deliberately", the opinion is still inadmissible because it comments on Awe's "lack of interest in or concern about something", or his "apathy."   *See* Indifferent, Black's Law Dictionary (11th ed. 2019).

Shulman's opinion regarding Awe's "indifferen[ce]" is also an unhelpful legal conclusion.   "If testimony . . . uses a term that has a specialized legal meaning that is more precise than the lay understanding of the term, the testimony is an impermissible legal conclusion." *Jay v. Royal Caribbean Cruises Ltd.*, 2022 WL 2187156, at *8 (S.D. Fla. June 17, 2022).   Courts regularly exclude expert testimony regarding whether an individual was "deliberately indifferent" as

inadmissible legal conclusions.[12]   The Court similarly finds that an opinion regarding Awe's "indifferen[ce]" is an unhelpful legal conclusion, since the word has more precise meaning in the context of Ross' Eighth Amendment claim than the average lay understanding of the term.  *See* Michael B. Mushlin, 1 Rights of Prisoners § 4:4.50 (5th ed. 2021) ("A prison official acts with deliberate indifference if he or she disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights.").

Ross does not contend that Shulman's use of the word "indifferent" is unrelated to Awe's state of mind, or that it is not an unhelpful legal conclusion.  Rather, he asserts "if Defendants' concern is that Dr. Shulman's use of the word 'indifferent' could be confusing to a jury to

---

[12] *See, e.g.*, *Cody v. City of St. Louis*, at *7 (E.D. Mo. June 28, 2022) ("[T]he experts' opinions regarding . . . whether the City acted with deliberate indifference are unsupported and unhelpful. . . .  Rather, the Court will instruct the jury as to the legal elements of Plaintiffs' claims."); *Rivera v. Cameron Cnty.*, 2022 WL 1009211, at *3 (S.D. Tex. Mar. 4, 2022) (Although an expert may "embrace[ ] an ultimate issue" such as who or what caused Plaintiff's death, he "may not offer legal conclusions in his testimony, such as whether the Plaintiffs can show that . . . the Defendants were deliberately indifferent to Rivera's serious medical needs."); *NeSmith v. Cnty. of San Diego*, 2022 WL 272011, at *10 (S.D. Cal. Jan. 28, 2022) (excluding opinion that "staff were not deliberately indifferent to [Decedent]'s medical or mental health needs" as an inadmissible legal conclusion); *Walker v. S. Health Partners*, 2021 WL 5988359, at *8 (E.D. Ky. Dec. 17, 2021) ("While [an expert] may testify regarding the nature, extent and quality of the medical care received, he may not testify that the defendants' actions were or were not deliberately indifferent in a legal sense.").

otherwise prejudicial, he can simply use a different word when presenting his opinions at trial." Doc. 66 at 13. The Court cannot evaluate the admissibility of this opinion if Shulman substituted an unspecified "different word." To the extent Shulman seeks to substitute a word other than "indifferent" which comments on Awe's state of mind, the opinion is still **EXCLUDED**. Defendants' motion to exclude the opinion is **GRANTED**. Doc. 61, in part.

3. "While Dr. Awe had neither the training nor the facilities to adjust the denture himself, he had an obligation to refer his patient to a clinician who could." Doc. 61-1 at 2 (quoting doc. 61-2 at 11).

Shulman's report summarizes Awe's testimony regarding Ross' appointment in October 2018, at which he "diagnosed a denture-related infection and prescribed an antibiotic and follow[-]up with the dentist." Doc. 61-2 at 10. Based on this encounter, Shulman opines that Awe had "an obligation to refer" Ross to a clinician to "adjust the denture." *Id.* at 11.

As discussed, an expert's opinion can be reliable if it is based his "knowledge, skill, experience, training, or education[.]" Fed. R. Evid. 702. Although "every expert is not required to provide the same degree of detail in linking his experience to his conclusions", *Pension Comm. of*

*Univ. of Montreal Pension Plan v. Banc'l of Am. Sec., LLC*, 691 F. Supp. 2d 448, 464 (S.D.N.Y. 2010),[13] the expert must still "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261; *see also* doc. 61-1 at 6 (Ross argues "Shulman is a dentist, not a board-certified internal medicine physician[.] . . . Furthermore, [Shulman] has never provided medical care to inmates, and more specifically, inmates incarcerated by the Georgia Department of Corrections.").

Although Shulman's report establishes his extensive qualifications in the field of correctional dentistry,[14] the report is silent as to how his

---

[13] *Compare, e.g., K.E.L.K. Corp. v. CCA Indus., Inc.*, 2019 WL 3854781, at *3 (M.D. Fla. May 21, 2019) (Expert with extensive experience in suncare marketing and distribution reliably opines on "best [industry] practices" in those areas by detailing experience and analyzing sales data), *with Nat'l Tr. Ins. Co. v. Columbia Nat'l Ins. Co.*, 2020 WL 4284813, at *3 (M.D. Fla. July 10, 2020) ("In general, [the insurance expert] fails to sufficiently link his opinions to his industry experience and/or the facts of this case. Rather, the Report merely provides a laundry list of [his] industry experience and the records he reviewed in this case [and conclusory opinions.]").

[14] Shulman is a board-certified dentist with 50 years of experience. Doc. 61-2 at 2. His report discusses his experience in correctional facility dental care policy, including his work with the United States Department of Justice investigating the adequacy of dental care at a prison, his supervision of dental students at a juvenile detention center, and his audit of dental programs in California and Ohio involving a total of 63 correctional institutions. *Id.* His CV lists his extensive publications on dental care, including multiple publications on dental care in correctional institutions. *Id.* at 21-29.

experience led him to a conclusion regarding a non-dentist's "obligation" to facilitate a referral for a "denture [adjustment]." *See generally* doc. 61-2; *see also* doc. 66 at 16 (Ross does not point to any portion of Shulman's report explaining how he applied his experience to reach this "obligation" opinion). And although he indicates that he reviewed the Georgia DOC standard operating procedures, doc. 61-2 at 15, Ross does not explain why the content of that document allowed Shulman to arrive at an opinion on a non-dentist's "obligation." *See generally* doc. 66. To be clear, Shulman's report need not state that "he had X experience, which [led him to Y opinion]." *Pension*, 691 F. Supp. 2d at 464. Absent *some* explanation why his correctional dentistry experience is a sufficient basis for the opinion, however, Defendants' motion to exclude the opinion is **GRANTED**. Doc. 61, in part; *see Frazier*, 387 F.3d at 1261.

4. "Thus Dr. Awe advising Mr. Ross to submit a dental sick call request while knowing there was no dentist at CSP amounted to him turning a blind eye to Mr. Ross's predicament." Doc. 61-1 at 2 (quoting doc. 61-2 at 12).

Shulman's report summarizes Awe's testimony that Ross should have submitted a dental "sick call" request to obtain a transfer to another facility for the diagnosis and treatment of his dental problem, as opposed to verbally mentioning the issue to Awe at his October 2018 appointment.

Doc. 61-2 at 11-12.  Shulman opines that Awe "turn[ed] a blind eye" to Ross' denture problem because the sick call procedure would not have resulted in Ross receiving dental treatment.  *Id.*

Awe argues that Shulman is not qualified to render this opinion, and that it is an "improper legal opinion."  Doc. 61-1 at 10.  Shulman's use of the phrase "turning a blind eye" is, charitably, vague.  To the extent Shulman opines that Awe recognized Ross' "predicament," and chose to disregard it, that opinion is **EXCLUDED** as an inadmissible opinion on Awe's state of mind.  *See e.g.*, *Wichterman*, 2019 WL 2568340, at *7.

To the extent Shulman uses the phrase "turning a blind eye" to opine that Awe's response to Ross' predicament was insufficient without commenting on his state of mind, the opinion is **EXCLUDED** pursuant to Fed. R. Evid. 403.  As discussed above, the Court may exclude evidence if its probative value is substantially outweighed by several enumerated dangers, including "confusing the issues" and "misleading the jury."  Fed. R. Evid. 403.  The Eleventh Circuit has clarified that "imprecise and unspecific" expert opinions may be excluded because they "could serve to confuse the jury, and [may] well . . . mis[lead] it."  *Frazier*, 387 F.3d at 1266.  Such opinions create the "potential for allowing the jurors to [make

an] . . . illegitimate inference[.]"  Kenneth W. Graham, 22A Fed. Prac. & Proc. Evid. § 5216.1 (2d ed. 2022).

Here, the probative value of a statement that Awe "turn[ed] a blind eye" to Ross' "predicament" is low because, as discussed, the precise meaning of the phrase is unclear from Shulman's report.  *See* doc. 61-2 at 12.  This low probative value is substantially outweighed by the high risk that jurors could interpret the opinion as a state-of-mind comment on Awe's recognition of Ross' predicament, and choice to ignore it. Accordingly, in light of the Court's obligation to "weigh the value of [expert opinions] against [their] potential to mislead or confuse", *Frazier*, 387 F.3d at 1263, this opinion is **EXCLUDED**, even if Shulman did not intend it as a comment on Awe's state of mind.  *See also* doc. 66 at 14 (Ross' response does not address whether this specific opinion impermissibly comments on Awe's state of mind).  Defendants' motion to exclude this opinion is **GRANTED**.  Doc. 61, in part.

5. That a prison medical director lacks the authority to refer his patient to another clinician, such as a dentist at ASMP, simply strains credulity. And even if Dr. Awe was convinced that he lacked the authority to initiate a referral to the ASMP dental department at least for a diagnosis and treatment plan, he could have reached out to the state dental director (or other appropriate authority) to facilitate a referral on behalf of his patient. Yet he did not. Surely, he did not doubt his authority to contact the state dental director.

Dr. Awe's failure to act on behalf of his patient is an illustration of trained incapacity and constitutes patient abandonment with respect to Dr. Ross's dental problem." Doc. 61-1 at 2-3 (quoting doc. 61-2 at 12-13) (emphasis added in Awe's *Daubert* motion).

Awe imprecisely frames this entire quoted portion as a single opinion. *See* doc. 61-1 at 10-11. The following excerpt is the first distinct opinion from the above-quoted portion, with more context from Shulman's report:

> Dr. Awe insists that he does not have the authority to request a consultation from a dentist at ASMP or another facility[.] . . . Rather, he testified that the request had to be made by the CSP dentist and approved by the statewide dental director. . . . That a prison medical director lacks the authority to refer his patient to another clinician, such as a dentist at ASMP, simply strains credulity.

Doc. 61-2 at 12. Shulman's conclusory opinion that Awe's testimony regarding his referral authority "strains credulity" is **EXCLUDED**. "Courts have noted that, pursuant to Rule 702, it is generally inappropriate for an expert witness to offer an opinion on the credibility of fact witnesses." *Withrow v. Spears*, 967 F. Supp. 2d 982, 998 (D. Del. 2013)) (collecting cases); *see also United States v. Beasley*, 72 F.3d 1518, 1528 (11th Cir. 1996) ("Expert medical testimony concerning the truthfulness or credibility of a witness is generally inadmissible because it invades the jury's province to make credibility determinations.").

Although courts have recognized that "undermin[ing] or contradict[ing] one party's theory of the case is not *necessarily* evidence attacking the credibility of that party's fact witnesses", *Walsh v. LG Chem Am.*, 2021 WL 4167310, at *4 (D. Ariz. Sept. 14, 2021) (emphasis added), Shulman's unexplained "simply strains credulity" assertion is an inadmissible "mere comment[ ]" on Awe's credibility. *Watts v. Hollock*, 2011 WL 6026998, at *6 (M.D. Pa. Dec. 5, 2011).

> Shulman's next challenged opinion is as follows:
>
> And even if Dr. Awe was convinced that he lacked the authority to initiate a referral to the ASMP dental department at least for a diagnosis and treatment plan, he could have reached out to the state dental director (or other appropriate authority) to facilitate a referral on behalf of his patient. Yet he did not.

Doc. 61-2 at 12-13. As discussed above, Shulman must at least "explain how [his] experience leads to the conclusion reached" for this opinion to be reliable. *Frazier*, 387 F.3d at 1261. Although his report establishes his experience in correctional dentistry, including dental audits in California and Ohio prisons, doc. 61-2 at 2, the report does not explain why his experience led him to his conclusions about a specific Georgia DOC official's ability to facilitate a referral for dental care. *See generally* doc. 66; *see also* doc. 61-2 at 15 (Shulman cites Georgia DOC's Standard

Operating Procedures as one of the documents he considered without discussing why it supports this conclusion).  To the extent Shulman seeks to testify that Awe could have contacted the state dental director, or some other authority, to facilitate Ross' referral, that opinion is **EXCLUDED**.

Next, Shulman's opinion that "[s]urely, [Awe] did not doubt his authority to contact the state dental director" is **EXCLUDED** because Shulman may not testify about Awe's state of mind, including whether he doubted his authority to do something.  *See* doc. 66 at 14-15 (Ross' response does not address this specific opinion).

Awe also challenges Shulman's opinion that "Dr. Awe's failure to act on behalf of [Ross] is an illustration of trained incapacity and constitutes patient abandonment with respect to [Ross'] dental problem." Doc. 61-2 at 13.  Awe argues that this is an "improper legal opinion in that it addresses whether Dr. Awe had the subjective knowledge necessary for the second element of Ross's deliberate indifference claim." Doc. 61-1 at 10-11.  Awe does not explain *why* Shulman's use of the phrases "trained incapacity" and "patient abandonment" relate to Awe's subjective knowledge, and the Court declines to exclude the opinion on

this basis.  Accordingly, Defendants' request to exclude Opinion # 5 is

**GRANTED, in part**, and **DENIED, in part**.  Doc. 61.

6.  "Dr. Awe was aware of Mr. Ross's mouth sores, pain, chewing difficulty, infection, difficulty sleeping and weight loss." Doc. 61-1 at 3 (quoting doc. 61-2 at 13).

In support of this opinion, Shulman cites Ross' testimony that he

told Awe about his dental symptoms on multiple instances.  *See* doc. 61-

2 at 11-12 n.16 (citing Ross' testimony at doc. 60-20 at 6).  Elsewhere in

the report, Shulman also notes that Awe recorded Ross' dental symptoms

at his October 4, 2018 appointment.  *Id.* at 6.  Defendants' motion to

exclude this opinion is **GRANTED** because, as discussed, whether Awe

was "aware" of Ross' symptoms is not a proper subject of expert

testimony.  Doc. 61, in part.  However, to the extent Shulman seeks to

testify about Ross' dental conditions based on the information in the

medical records, that testimony is permissible.

7.  "Simply put, Dr. Awe had it in his power to see to it that his patient had an appropriate referral but refused to do so."  Doc. 61-1 at 3 (quoting doc. 61-2 at 13).

This opinion appears in the brief "Summary" portion of Shulman's

report.  Doc. 61-2 at 13.  As discussed, to the extent Shulman seeks to

testify that Awe had in "in his power" to facilitate Ross' referral, that

testimony is **EXCLUDED** because Shulman does not explain why his experience led him to that conclusion.

    8.    "Dr. Awe knew (or should have known) that these conditions suffered by Mr. Ross would not improve until he could be seen by a dentist for treatment." Doc. 61-1 at 3 (quoting doc. 61-2 at 13).

For the reasons discussed above, Shulman's opinions regarding what Awe knew are **EXCLUDED** as impermissible state-of-mind opinions. And his opinions about what Awe "should have known" are **EXCLUDED** as unhelpful in this deliberate indifference case. *See also* doc. 66 at 17 (Ross tersely states that this opinion "may be relevant to the ultimate issue of whether Defendant Awe acted with deliberate indifference."). Defendants' motion to exclude Opinion # 8 is therefore **GRANTED**. Doc. 61, in part.

    9.    "[E]ven once the new dentist, Dr. Gevirtz, arrived at CSP on November 5, 2018, Mr. Ross was not seen for treatment for over two months—which further evidces Dr. Awe's failure to ensure that his patient received necessary treatment in a timely manner." Doc. 61-1 at 3 (quoting doc. 61-2 at 13).

Awe attacks this opinion by reasserting his conclusory "legal opinion" challenge:

> [This] constitutes an improper legal opinion in that evidence of "Dr. Awe's failure to ensure that his patient received the necessary treatment in a timely manner" is an opinion as to

> whether Dr. Awe had the subjective knowledge necessary for the second element of Ross's deliberate indifference claim.

Doc. 61-1 at 12. Awe does not explain why an opinion about his alleged failure to ensure that Ross received treatment in a timely manner relates to Awe's "subjective knowledge", and his motion is **DENIED** on this point. Doc. 61, in part.

> 10. "During the extensive time period that Mr. Ross went without proper treatment, he suffered gratuitous pain and chewing difficulty, infection, difficulty sleeping, and weight loss." Doc. 61-2 at 13-14 (quoted, in part, by doc. 61-1 at 12-13).

In a cursory sentence, Awe asserts that this is an "improper legal opinion" because "Shulman's opinion that Dr. Awe caused Ross 'gratuitous' pain directly addresses the availability and appropriateness of punitive damages." Doc. 61-1 at 12-13. Absent any articulation why the word "gratuitous" impermissibly relates to punitive damages, Awe's motion is **DENIED** on this point. Doc. 61, in part.

To summarize, Defendants' request to exclude Shulman's testimony because it is not based on a "recognized scientific method" is **DENIED**. Doc. 61, in part. To the extent they request a blanket exclusion on Shulman's opinions regarding Awe's "medical care", that request is **DENIED**. Doc. 61, in part. Shulman's opinions regarding

what Awe "knew" or "should have known" are **EXCLUDED**.  Finally, all of the ten listed opinions are **EXCLUDED** except the following: Shulman's opinion that "Dr. Awe's failure to act on behalf of [Ross] is an illustration of trained incapacity and constitutes patient abandonment with respect to [Ross'] dental problem," doc. 61-2 at 13, and his opinion that "even once the new dentist . . . arrived at CSP . . . Ross was not seen for treatment for over two months—which further evidences Dr. Awe's failure to ensure that his patient received necessary treatment in a timely manner."  Doc. 61-1 at 3 (quoting doc. 61-2 at 13).  Finally, to the extent Shulman seeks to testify about Ross' dental conditions based on the information in the medical records, that testimony is permissible.

## II. _Defendants' Motion for Summary Judgment_

Defendants request summary judgment on all of Ross' claims.  _See generally_ doc. 60-1.  Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  _FindWhat Inv'r Grp. v. FindWhat.com_, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting _Anderson v. Liberty Lobby, Inc._, 477

U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. *See Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. *See id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. *Anderson*, 477 U.S. at 257.  Where the nonmovant attempts to carry this burden with nothing more "than a repetition of his conclusional

40

allegations, summary judgment for the [movant is] not only proper but required." *Morris v. Ross*, 663 F.2d 1032, 1033-34 (11th Cir. 1981).

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in the light most favorable to the nonmoving party. *Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County*, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing R*odriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 616 (11th Cir. 2007)). However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* (emphasis and citations omitted). Moreover, although all reasonable inferences are to be drawn in favor of the nonmoving party, "an inference based on speculation and conjecture is not reasonable." *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013).

A. *Ross' Deliberate Indifference Claims*

Ross asserts claims against Defendants under 42 U.S.C. § 1983, which provides judicial remedies to a claimant who can prove that a person acting under color of state law committed an act that deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States. 42 U.S.C. § 1983. The Eighth Amendment mandates that prison officials provide medical care and "must take measures to guarantee the safety of inmates." *Farmer*, 511 U.S. at 832 (internal citations and quotations omitted).

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held that the Eighth Amendment proscription against cruel and unusual punishment prevents prison personnel from subjecting an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106. The Court cautioned, however, that not every allegation of inadequate medical treatment states a constitutional violation. *Id.* at 105. A prisoner plaintiff's mere disagreement with the medical care provided does not amount to a constitutional violation. *See McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999) (citation omitted) ("However, not 'every claim by a

prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.'").  "Medical treatment violates the eighth amendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."  *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (internal citation omitted).

To prevail, Ross must: 1) satisfy an "objective component" by showing that he had a serious medical need; 2) satisfy a "subjective component" by showing that Defendants acted with deliberate indifference to his serious medical need; and 3) show that the injury was caused by the defendants' wrongful conduct.  *Goebert*, 510 F.3d at 1326. "A medical need is objectively serious if it has been diagnosed by a physician as mandating treatment or [is] one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (internal citation omitted).  If Ross satisfies this objective component, then under the subjective component he must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence.  *Id.* at 1327.

1. *A reasonable jury could conclude that Ross had a serious medical need.*

The parties dispute whether Ross' missing dentures constitute a serious medical need.  *Compare* doc. 60-1 at 16-18 *with* doc. 67 at 9-13. The Eleventh Circuit has recognized that "[i]n certain circumstances, the need for dental care combined with the effects of not receiving it may give rise to a sufficiently serious medical need to show objectively a substantial risk of serious harm." *Farrow v. West*, 320 F.3d 1235, 1243-44 (11th Cir. 2003).  This Court has found it to be "universally recognized that a dental problem of whatever nature that results in significant pain qualifies as a serious medical need." *Newsome v. Prison Health Serv., Inc.*, 2009 WL 1469203, at *5 (S.D. Ga. May 29, 2009) (collecting cases). Ross testified that without his denture, he experienced pain and blistering in his mouth, infection, chewing difficulty, difficulty sleeping, and weight loss.  Doc. 60-20 at 13, 24.  Ross has, therefore, offered sufficient evidence from which a jury could conclude that he suffered from a serious medical need caused by his missing denture.  Summary

judgment would, therefore, be inappropriate on this issue and should be

**DENIED**.  Doc. 60, in part.

2. _The parties are directed to submit additional briefing on this issue_
   _of Awe's deliberate indifference._

Ross alleges that Awe was deliberately indifferent to his need for

"dental care—*i.e.*, replacement dentures—for over 16 months."  Doc. 41

at 13.  He also alleges that Awe "failed to respond to Plaintiff's serious

medical condition in an objectively reasonable manner, including but not

limited to failing to send Plaintiff to another prison or facility to receive

necessary dental care."  *Id.* at 14.  Defendants respond that Awe "did not

have authority to provide the routine dental care to inmates," doc. 60-1

at 19, and that Awe "continued to prescribe Ross Fentanyl for pain,

prescribed Ross Ensure and an additional daily snack to help with any

weight loss, and prescribed him Augmentin in October of 2018 when Dr.

Awe believed that Ross had an infection in his mouth," *id.* at 20.

Therefore, Awe contends he we not deliberately indifferent and summary

judgment is appropriate.

In response to Defendants' arguments, Ross first argues that Awe's

own testimony suggests that he did, in fact, have authority to refer his

patient to another facility for dental care, and that as the Medical

Director there were avenues available for him to secure the referral.  Doc. 67 at 14-15; *see also id.* at 14-15, n. 5.  Ross also argues the Awe's failure to refer him to an outside dental facility for further care or to ensure that he received timely treatment for his medical issue constitutes sufficient evidence to support a finding of deliberate indifference, the medical care provided notwithstanding.  *See* doc. 67 at 15-18.

The above disposition of the Defendants' *Daubert* Motion complicates the Court's analysis of the parties' arguments on this issue. In responding to each of Defendants' arguments regarding Awe's alleged deliberate indifference, Ross relies, in substantial part, on Shulman's report.  *See* doc. 67 at 17 (arguing that a reasonable jury could find that Awe "simply forced Mr. Ross to wait until CSP hired a new dentist rather than taking steps to refer him to another facility for timely treatment," and citing to Shulman's report); 14 (citing to Shulman's report to support the assertion that Awe's testimony regarding his referral authority is "difficult to comprehend.").  However, in light of the exclusion of portions of Shulman's testimony, it is not clear what remains to support Ross' arguments.  The Court will not construct the parties' arguments for them.

The Federal Rules provide that "[i]f a party fails to properly support an assertion of fact . . . , the court may . . . give an opportunity to properly support . . . the fact," or "issue any other appropriate order." Fed. R. Civ. P. 56(e)(1), (4).  The Advisory Committee suggests that "[i]n many circumstances," giving a party an opportunity to properly support an assertion of fact "will be the court's preferred first step."  Fed R. Civ. P. 56 advisory committee's note to 2010 amendment.  The Court will do so here.

Accordingly, the undersigned **DEFERS** making a recommendation on defendants' request for summary judgment on Awe's alleged deliberate indifference.  Defendants are **DIRECTED** to file a supplemental brief, and supporting materials including, but not limited to, amended statements of material facts, in support of their Motion for Summary Judgment addressing the question of Awe's deliberate indifference no later than 14 days from the date of the District Judge's final disposition of the remaining issues in the Defendants' Motion for Summary Judgment.[15]  Plaintiff shall then have 21 days to respond,

---

[15] These instructions are subject to any additional or alternative instructions which may be contained in the District Judge's Order.

including a statement of facts controverting defendants' amended statement. *See* S.D. Ga. L. Civ. R. 7.5, 56.1. Given the recommended dispositions on the remaining issues, both parties are advised that the supplemental brief should be limited to the propriety of summary judgment on Plaintiff's claim that Awe was deliberately indifferent.[16] This case is **STAYED** pending the parties' compliance with the instructions above. The Clerk is **DIRECTED** to lift the stay upon the District Judge's disposition of the entirety of the Motion for Summary Judgment, doc. 60.

3. *Defendants' motion for summary judgment on Ross' deliberate indifference claim against Rivers should be granted.*

Next, Defendants raise two distinct arguments in support of their request for summary judgment on Ross' deliberate indifference claims against Rivers. *See* doc. 60-1 at 20-23. First, they assert that Rivers' alleged failure to "process the grievances that Ross claims he filed" is insufficient to establish deliberate indifference. *Id.* at 21. Second, they argue that despite Rivers' status as a "non-medical" prison official who was "required to defer to the expertise of the CSP medical and dental

---

[16] As discussed below, the parties' supplemental briefing may also clarify whether Awe is entitled to qualified immunity on Ross' deliberate indifference claim against him.

staff", she made sufficient efforts to "help with Ross['] dentures" by sending an email to Gregory, and by raising the issue with the dental department on three separate occasions. *See* doc. 60-1 at 21-22.

Ross does not address Defendants' argument regarding Rivers' grievance processing. *See* doc. 67 at 18-21. Ross' argument on the issue of Rivers' deliberate indifference is limited to the sufficiency of her email to Gregory and three dental department conversations as responses to Ross' condition. *See id.* Specifically, he argues that Rivers' non-medical status does not insulate her from liability because she had "a reason to believe, if not actual knowledge, that the care being provided to . . . Ross was inadequate[.]" *Id.* at 18-19 (citing, *e.g.*, *Stallworth v. Graham*, 2015 WL 4756348, at *5 (N.D. Ala. Aug. 11, 2015)). Ross argues that Rivers was deliberately indifferent to Ross' condition because she "did not adequately follow up" with Gregory or the dental department. *Id.* at 20-21. Ross also notes that Rivers "did not even speak to Dr. Awe, despite his role as CSP's Medical Director." Doc. 67 at 21. Ross does not contend that there is a dispute of material fact regarding Rivers' email and three conversations; rather, he argues that "[b]ased on [the] evidence, a

reasonable jury could conclude that . . . Rivers acted with deliberate indifference to Mr. Ross's serious dental problem." Doc. 67.[17]

The measure of the adequacy of a response to a serious medical need is "reasonableness in light of the surrounding circumstances." *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). Further, "[a]n Eighth Amendment 'medical treatment claim [will] not lie against non-medical personnel unless they were personally involved in the denial of treatment or deliberately interfered with prison doctors' treatment. Prison officials are entitled to rely on the opinions, judgment and expertise of a prison medical staff to determine a medically necessary and appropriate cause of treatment for an inmate.' " *Truschke v. Chaney*, 2018 WL 814579, at *5 (S.D. Ga. Feb. 9, 2018) (quoting *Baker v. Pavlakovic*, 2015 WL 4756295, at *7 (N.D. Ala. Aug. 11, 2015)).

The record indicates that the only way Ross could have received treatment for his dental condition during the period when CSP did not have a dentist was to submit a sick call, which would be processed by the

---

[17] Ross notes that "there is some dispute about when Defendant Rivers first learned that Mr. Ross lost his dentures" but does not raise any argument regarding this dispute. Doc. 67 at 19.

dental department.[18]  Rivers testified that every time Ross notified her about his dental condition beginning in October 2018, she notified the dental department, which was the only department at CSP capable of facilitating a dental referral.  *See* doc. 60-18 at 79.  She also testified that "the [third] time she spoke to someone in the dental department" in response to Ross' complaints, she spoke to Gevirtz, who had started working at CSP by then.  *Id.* at 80.  Gevirtz informed her that Ross was the "th[ird] or fourth" inmate on the denture list.  *Id.*  Ross does not explain why contacting the only prison department capable of facilitating a referral is an unreasonably insufficient response.  *See* doc. 67 at 21 (generally noting that "Rivers' attempts to render aid were simply not enough, because she did not ensure that her efforts had helped to resolve Mr. Ross's serious medical needs.").  Ross provides an example of a specific action Rivers should have taken: "[Rivers] did not even speak to Dr. Awe, despite his role as CSP's Medical Director."  Doc. 67 at 21; *see*

---

[18]  *See, e.g.*, doc. 60-10 at 93 ("[Ross has a] responsibility to put in a sick call, just like every other inmate, that . . .wants to be seen for . . . denture care."); *id.* at 106-107 ("If the patient put in a dental sick call during the time that there's no dentist in house, those sick call . . . were triaged [and] forwarded to the dental department."); *id.* at 29 ("The dental department functions on its own. . . . The dentist make[s] [dental referral] decision[s], supposed to call and talk to the statewide medical director, the statewide dental director, you know, on his own. If it's -- if he needs to send somebody anywhere, that's how it's supposed to be done, you know.").

*also id.* at 20 (vaguely asserting that Rivers "did not adequately follow up"); *id.* at 21 ("she made no further efforts, including efforts to secure Mr. Ross a referral to an outside dentist.").

Ross cites no authority suggesting that Rivers' alerting appropriate medical staff was insufficient. The out-of-circuit district court authority he does cite suggests only that summary judgment was inappropriate in favor of a defendant who "does not deny that she is responsible for ensuring referrals are carried out," and "failed to get an appointment . . . for 42 days . . . ." *Burgos v. Philadelphia Prison Sys.*, 760 F. Supp. 2d 502, 511-512 (E.D. Pa. Jan. 3, 2011); *see also* doc. 67 at 19-20. That authority is not sufficient to support Ross' asserted general principle that "[u]pon becoming aware of a medical problem that is going unmet, non-medical staff can no longer defer to medical staff exclusively. Instead, they must follow up to ensure needs are being met." Doc. 67 at 19.

As the Seventh Circuit has explained, the general view is that a non-medical employee might be deliberately indifferent if she "ignored [a prisoner's] complaints entirely, but we can see no deliberate indifference given that [a defendant] investigated the complaints and referred them to the medical providers who could be expected to address [the prisoner's]

concerns." *Geeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005). Ross concedes that Rivers took steps to address his complaints, including "speak[ing] with the [CSP] dental assistants on two separate occasions," who informed her that they "would not be sending Mr. Ross out for care." Doc. 67 at 21. She also testified that, upon speaking to the prison personnel who were responsible for providing dental care, they informed her that they were aware of Ross' situation "and they didn't consider that as being an emergency . . . ." Doc. 60-18 at 78-79. Rivers was not required to second-guess that judgment.[19]  *See, e.g., Moon v. Reviere*, 2021 WL

---

[19]  Ross is correct that a non-medical staff's deference to medical opinions is not unlimited. *See* doc. 67 at 18-19. However, Ross' argument that the treatment that he was undisputedly receiving, even if it was not effective to entirely alleviate all of his pain, amounted to his "not reciev[ing] *any* effective care . . . ," *id.* at 19, such that Rivers, a lay person, was liable for failing to second guess medical opinion is simply not convincing and is unsupported by any legal authority. Ross' assertion that his "medical problem . . . [was] going unmet . . . ," is simply an overstatement of the record and a misinterpretation of the law. *See id.* Accepting his argument would, effectively, impose greater responsibility for prisoners' medical care on lay employees than medical staff. It is clear that medical staff are not deliberately indifferent when they provide negligent care, which is, necessarily, "inadequate." *See Estelle*, 429 U.S. at 106 ("Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Moreover, a prisoner's expression of dissatisfaction with the treatment provided, even when that dissatisfaction is based on persistent pain, does not state a deliberate indifference claim against medical personnel. *See, e.g., Smith v. Wood*, 2019 WL 13068185, at*7 (N.D. Ga. Oct. 31, 2019) (dismissing deliberate indifference claim that "essentially amounts to a disagreement with medical treatment . . . , even if the new pain medication . . may not have been as effective."). Under Ross' theory, however, a lay employee's "reason to believe," that medical staff is providing "inadequate" care, which might amount to no more than a

3700714, at *10 (S.D. Ga. Aug. 19, 2021) (Hall, C.J.) ("It is widely held that non-medical prison personnel are generally entitled to rely on the expertise of the medical staff *and are not required to second-guess the medical staff's judgment regarding an inmate's care*." (emphasis added) (internal quotations, alterations, and citation omitted). *Cf. Barcelona v. Parish*, 2021 WL 3238819, at *5 (11th Cir. July 30, 2021) (noting "we have found no authority to support a claim against a nearby prison official when it is doubtful that he had reason to second-guess a medical professional's assessment or authority to override [the medical professional's] medical judgment," in finding leave to amend deliberate indifference claim was futile).

As discussed, Defendants also argue that the Court should grant summary judgment on Ross' deliberate indifference claim against Rivers because her alleged failure to "process the grievances . . . regarding his

---

prisoner's expression that he continues to experience pain, requires the lay employee to "follow up to ensure that needs are being met." *See* doc. 67 at 19. Nothing in Ross' brief even suggests so extravagant a standard. The Court notes that in the case he cites in support of the general proposition that deference is not unlimited, the court went on to note the prevailing standard, discussed above. *Compare* doc. 67 at 18 (citing *Stallworth*, 2015 WL 4756348, at *5), *with Stallworth*, 2015 WL 4756348, at *5 (granting summary judgment for non-medical defendant because "[t]here [was] nothing in the record which shows that [the lay defendant] was aware of facts from which he *as a layperson* should have known that the" medically-approved treatment of the plaintiff was medically inappropriate).

dentures does not state a constitutional violation." Doc. 60-1 at 21; *see also* doc. 67 at 18-21 (Ross does not specifically address whether Rivers' processing of the alleged grievances was constitutionally insufficient). As the Court explained in its prior Report and Recommendation ("R&R"), doc. 11 at 11-12, the denial or failure to act upon a grievance generally does not create liability under § 1983. *See Clark v. Bandy*, 2011 WL 1346975 at *4 (N.D. Ga. Apr. 8, 2011) ("A prison official's mere participation in a grievance procedure—for example, by denying a prisoner's grievance—is not actionable under § 1983." (citations omitted)). Internal grievance procedures do "not provide an inmate with a constitutionally protected interest." *Thomas v. Poveda*, 518 F. App'x 614, 618 (11th Cir. 2013); *see also Doe v. Moore*, 410 F.3d 1337, 1350 (11th Cir. 2005) ("State-created procedural rights that do not guarantee a particular substantive outcome are not protected by the Fourteenth Amendment, even where such procedural rights are mandatory." (quotations omitted)); *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991) (federal prison administrative remedy procedures "do not in and of themselves create a liberty interest in access to that procedure," and that "the prisoner's right to petition the government for redress is the right of

access to the courts, which is not compromised by the prison's refusal to entertain his grievance"). As Ross "has no constitutionally-protected liberty interest in access to [the grievance] procedure," the blocking of that access cannot alone be the basis for a § 1983 claim. *Bingham v. Thomas*, 654 F.3d 1171, 1177 (11th Cir. 2011). If anything, Ross' testimony that he filed grievances, *see, e.g.*, doc. 60-20 at 21, is evidence that Rivers knew about his alleged dental condition. As discussed, Ross has not shown that Rivers' response to Awe's symptoms constituted deliberate indifference, and evidence that she knew about the symptoms via the grievance procedure does not address the issue. Accordingly, Defendants' summary judgment motion regarding Ross' deliberate indifference claims against Rivers should be **GRANTED**. Doc. 60, in part.

B. *Defendants' motion for summary judgment on Ross' retaliation claims should be granted.*

Defendants also request summary judgment on Ross' retaliation claims. Doc. 60-1 at 24-25. Specifically, Ross alleges that Awe and Rivers retaliated against him because he filed a prior lawsuit against "other

officials" at CSP.  Doc. 41 at 16; *see also* doc. 60-4 at 8-9 (Awe's declaration

identifies the defendant in that suit as former CSP employee Dr. Fogam).

The First Amendment prohibits prison officials from retaliating

against prisoners for exercising their right of free speech. *Farrow*, 320

F.3d at 1248; *Thomas v. Evans*, 880 F.2d 1235, 1242 (11th Cir. 1989)

("The gist of a retaliation claim is that a prisoner is penalized for

exercising a right of free speech.").  It is well-established that "[p]rison

officials may not retaliate against inmates for filing lawsuits or

administrative grievances." *Williams v. Brown*, 347 F. App'x 429, 435

(11th Cir. 2009) (citations omitted).  To prevail on a retaliation claim, a

plaintiff must establish that (1) he engaged in constitutionally protected

conduct; (2) the defendant's retaliatory act adversely affected the

protected conduct; and (3) there is a causal connection between the

retaliatory act and the adverse effect on the conduct. *Smith v. Fla. Dep't

of Corr.*, 713 F.3d 1059, 1063 (11th Cir. 2013).  "To establish causation,

the plaintiff must show that the defendant was subjectively motivated to

discipline the plaintiff for exercising his First Amendment rights."

*Moton*, 631 F.3d at 1341 (quotations and citation omitted).  Accordingly,

"a prisoner must demonstrate that . . . but for the retaliatory motive, the

adverse act complained of would not have occurred." *Webb v. Boyd*, 2017 WL 603005, at *6 (M.D. Ala. Jan. 23, 2017) (citing *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995)).

There is no dispute that, during the time Ross was missing his denture, Awe and Rivers were both aware that Ross previously filed a lawsuit against a CSP official. *See* doc. 67-7 at 17; *id.* at 20.[20] Defendants argue that the Court should grant summary judgment on the retaliation claims because Ross has not established causation. *See* doc. 60-1 at 24-25 (Defendants do not argue that Ross' prior lawsuit is not constitutionally protected conduct, or that they did not know about the prior lawsuit). Ross counters that the causation issue should be resolved by a jury. Doc. 67 at 22-23.

In support of their summary judgment request regarding Ross' retaliation claims against Awe, Defendants cite Awe's declaration:

> Though I was aware that Ross had previously filed a lawsuit against formed CSP employee Dr. Fogam, I provided Ross with the same medical care as I would have provided to any other inmate in his situation. My treatment to Ross did not

---

[20] The record indicates that Awe knew that Ross filed a lawsuit against Dr. Fogam, doc. 67-7 at 27, while Rivers was aware that Ross filed a lawsuit against a CSP official, *id.* at 20. *See also* doc. 60-1 at 24.

> change because of my knowledge of his previous lawsuit
> against Dr. Fogam.

Doc. 60-1 at 24-25 (quoting doc. 60-4 at 8-9).[21]  The only evidence Ross

cites in his response to rebut this declaration is "the record evidence that

other inmates were referred to outside dentists during the time period

that Mr. Ross was refused the urgent dental care he needed."  *See* doc. 67

at 22.  Ross does not explain why the fact that other inmates were

referred for dental care suggests that Awe took some adverse action

against Ross because of a prior suit, particularly in light of the previously

described evidence about the structure for dental referrals.  *See id.* at

22.[22]

The only evidence that Ross points to establishes, at most, that

other inmates were treated differently than Ross.  There is simply no

---

[21]  Ross briefly criticizes Awe's assertion as a "self-serving declaration" used as "affirmative proof."  Doc. 67 at 22.  The Court will consider Awe's declaration in this summary judgment context absent a specific argument why it should not.  *See Jackson v. Catanzariti*, 2019 WL 4879041, at *20 (S.D. Ga. Oct. 2, 2019) ("And while Plaintiffs take issue with Defendant Wells' reliance on his 'self-serving' declaration . . . it is Plaintiffs' burden to prove their case."); *see also C.R. Pittman Const. Co., Inc.*, 453 F. App'x at 443 ("If all 'self-serving' testimony were excluded from trials, they would be short indeed."); *cf. Stovall v. Duncan*, 2014 WL 1818152, at *3 (S.D. Ga. May 7, 2014) (declining to consider a "self-serving declaration" based on "speculat[ion].").

[22]  Although Ross does not raise the issue in his response brief, he provided the following account of one of his appointments with Awe at his deposition:

indication that the different treatment was based on prior lawsuits. In the absence of any such indication, the causal connection between the different treatment Ross undisputedly received and his First Amendment protected activity is, therefore, no more than speculative. Accordingly, Defendants' summary judgment motion should be **GRANTED** with respect to Ross' retaliation claim against Awe. Doc. 60, in part.

---

I wasn't even thinking about a lawsuit when I was trying to get dentures from [Awe]. He the one that brought that up. He the one talking about, well, I'm not going to send you [for dentures] so quit asking. He said, I done got you some antibiotic for your mouth. So I know you fixing to go do whatever you're going to do. You're fixing to write some grievance up on me or file a lawsuit. He said, it ain't going nowhere. He said, go do what you're going to do. So I said, okay, if that how you feel that's what I will do. He said, who cares? I said, okay, but I ain't just going to file no grievance on you. I said, I'm going to take it all the way to the courthouse when I get to the courthouse. [And] that's how I went.

Doc. 67-7 at 20 (Ross' response to Awe's Statement of Material Facts) (quoting doc. 60-20 at 22)). Even if Ross had raised this testimony to argue the causation issue, his account of Awe's comments is, at most, evidence that Awe knew about the prior suit, and was irritated by it. Given the previously-discussed evidence that Awe did not have the ability to facilitate a referral for Ross' denture care, the testimony is not evidence that Awe took some adverse action against Ross, let alone that the adverse action would not have occurred but-for the prior lawsuit. *See Webb*, 2017 WL 603005, at *6.

Defendants cite the following declaration by Rivers in support of their request for summary judgement on the retaliation claim against her:

> I understand that Mr. Ross alleges in his lawsuit that I failed to process certain grievances he claims to have filed in 2018 and 2019 regarding his dentures in retaliation for a previous lawsuit that he filed against former CSP employee Dr. Fogam. While I was aware in 2018 and 2019 that Mr. Ross had previously filed a lawsuit since he arrived at CSP, I did not treat him any differently or process his grievances any differently because he had previously filed a lawsuit, including any grievances he may have filed in 2018 or 2019.

Doc. 60-1 at 24-25 (citing doc. 60-17 at 2).   As with his argument regarding the retaliation claim against Awe, the only evidence Ross cites is "the record evidence that other inmates were referred to outside dentists during the time period that Mr. Ross was refused the urgent dental care he needed."  Doc. 67 at 22.  This evidence does not indicate that Rivers took some adverse action against Ross based on the prior lawsuit, and Defendants' motion for summary judgement on Ross' retaliation claim against Rivers should be **GRANTED**.  Doc. 60, in part.[23]

---

[23] Ross does not discuss his testimony regarding Rivers' alleged retaliation in his response brief, but it is quoted in the Statement of Material Facts:

> [Rivers] ain't never just said nothing nasty.  It's always baby this, baby that. I gotcha. And this went on for months.  But see all of them friends. Every last one of them, they friend[s].  Them people were friends before

C. *Defendants have not shown that they are entitled to qualified immunity.*

Defendants also contend that they are entitled to qualified immunity. Doc. 60-1 at 25. "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). The doctrine is "intended to 'allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law.' " *Hoyt v. Cooks*, 672 F.3d 972, 977 (11th Cir. 2012) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). As a result, qualified

---

I got there. And then when I got their man, after Dr. Fogam got sued, Dr. Fogam had left and went to Jackson Prison. But he was the Medical Director then. Dr. Awe he was just a doctor. . . . These people run—they been working together for years. I go up there and mess the whole thing up with a lawsuit.

Doc. 60-2 at 18 (quoting doc. 60-20 at 22). Even if Ross had raised this testimony in his briefing, it would be insufficient to create a dispute of fact regarding causation. *See Lawson v. Gillman*, 2017 WL 5634159, at *9 (N.D. Fla. July 25, 2017) (Plaintiff's "unsupported speculation" regarding causation is insufficient to create a genuine issue of material fact in the retaliation context).

immunity "liberates government agents from the need to constantly err on the side of caution by protecting them both from liability 'and the other burdens of litigation, including discovery.'" *Holmes v. Kucynda*, 321 F.3d 1069, 1077 (11th Cir. 2003) (quoting *Lambert v. Fulton Cnty.*, 253 F.3d 588, 596 (11th Cir. 2001)). But qualified immunity does not protect an official who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff." *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)).

To rely upon qualified immunity, a defendant must first show that he acted within his discretionary authority. *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1352 (11th Cir. 2015). Specifically, a defendant must show that he "was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). If a defendant makes the requisite showing, the Court must grant defendants qualified immunity unless plaintiff has shown (a) a violation of the Constitution by any defendant, (b) the illegality of which was clearly established at the time of the

incident. *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010)

(citations omitted); *see also Charles v. Johnson*, 18 F.4th 686, 698 (11th

Cir. 2021) (quoting *District of Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct.

577, 589 (2018)).

The following is the entirety of Defendants' qualified immunity

argument:

> In this case, all of the acts described by the Plaintiff occurred
> within the context of the Defendants' alleged job functions at
> CSP, and therefore the Defendants were acting within the
> scope of their discretionary authority. Thus, the Plaintiff
> must establish a violation of a clearly established
> constitutional right to show that qualified immunity is not
> appropriate. Even assuming, arguendo, that Plaintiff can
> show a constitutional violation, the Defendants are entitled to
> qualified immunity because those rights were not clearly
> established at the time of the alleged violations.

Doc. 60-1 at 25 (recitation of qualified immunity standard omitted); *see*

*also* doc. 67 at 23 (in his response, Ross only argues that Defendants are

not entitled to qualified immunity because they violated his "clearly

established" right). This conclusory, citationless paragraph is

insufficient. For an official to discharge his burden of demonstrating that

he acted within his discretionary authority, "there must be a showing by

competent summary judgment materials of objective circumstances that

would compel that conclusion." *Harbert Int'l, Inc. v. James*, 157 F.3d

1271, 1282 (11th Cir. 1998) (quoting *Barker v. Norman*, 651 F.2d 1107,

1124-25 (5th Cir. 1981)).  The inquiry is fact specific.  As the Eleventh

Circuit explained:

> Exactly what will suffice to establish such objective
> circumstances will . . . vary in proportion to the degree of
> discretion inherent in the defendant's office.  Such objective
> circumstances necessarily must encompass the factual
> context within which the complained-of conduct took place.
> But also appropriate is a showing by the defendant of facts
> relating to the scope of his official duties—e.g., a showing of
> the circumstances through which he initially came to believe
> that his lawful authority including within its scope actions of
> the type that are complained of by the plaintiff.

*Id.* (ellipses in original).  Absent any discussion of the facts in the record

relating to the scope of Defendants' official duties, *see* doc. 67 at 23, the

Court cannot conclude that they are entitled to qualified immunity.  *See*

*Harbert*, 157 F.3d at 1282 ("[a] bald assertion that the acts [at issue in a

qualified immunity analysis] were taken pursuant to the performance of

duties and within the scope of duties will not suffice.").  Accordingly, their

request for summary judgment based on qualified immunity should be

**DENIED**.  Doc. 60, in part.

## CONCLUSION

For the foregoing reasons, Defendants' *Daubert* Motion is

**GRANTED, in part**, and **DENIED, in part**.  Doc. 61.  Defendants'

summary judgment motion should be **GRANTED, in part**, as to Ross' deliberate indifference claim against Rivers, and his retaliation claims against Awe and Rivers.   Doc. 60.   The Court **DEFERS** ruling on Defendants' motion for summary judgment on Ross' deliberate indifference claim against Awe pending the previously-discussed additional briefing.  Defendants' previously-discussed supplemental brief is due 14 days from the date of entry of this Order.   Ross must respond within 21 days.   Finally, given the Court's instructions regarding the additional briefing, this case is **STAYED**.   The Clerk is **DIRECTED** to lift the stay when the District Judge disposes of the entirety of Defendants' summary judgment motion, doc. 60.

This report and recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3.  Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties.  The document should be captioned "Objections to Magistrate Judge's Report and Recommendations."  Any request for additional time

to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge. The district judge will review the magistrate judge's findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to timely file objections will result in the waiver of rights on appeal. 11th Cir. R. 3-1; *see Symonette v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO ORDERED AND REPORTED AND RECOMMENDED**, this 31st day of August, 2022.

CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA